# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| ABUNDANT LIFE BAPTIST CHURCH OF LEE'S SUMMIT, MISSOURI, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 4:20-00367-CV-RK |
| JACKSON COUNTY, MISSOURI, JACKSON COUNTY HEALTH DEPARTMENT, FRANK WHITE JR., TROY SCHULTE, BRIDGETTE SHAFFER, TRUMAN MEDICAL CENTER, INCORPORATED, | ) ) ) ) ) ) | |
| Defendants. | | |

## ORDER

Before the Court are two motions to dismiss: one filed by Defendants Jackson County, Missouri, Troy M. Schulte, and Frank White, Jr. (Doc. 33); and another filed by Defendants Jackson County Health Department ("Health Department"), Bridgette Shaffer, and Truman Medical Center, Inc. ("TMC") (Doc. 34). The motions are fully briefed. (Docs. 38, 41, and 42.) For the reasons set forth below, the motions are **DENIED** in part and **GRANTED** in part.

## I. OVERVIEW

Plaintiff Abundant Life Baptist Church of Lee's Summit, Missouri, is a church located in Jackson County, Missouri.[1] Plaintiff filed its First Amended Complaint ("Complaint") on October 30, 2020. (Doc. 24.) Plaintiff alleges Defendants Health Department, TMC,[2] White,[3] Shaffer,[4] and Schulte[5] discriminated and continue to discriminate against religious groups and activity in issuing emergency public health orders in response to the threat posed by the novel coronavirus

---

[1] Unless otherwise noted, the following facts are taken from the First Amended Complaint for Declaratory Judgment and Injunctive Relief. (Doc. 24.)

[2] Plaintiff alleges the Health Department's operations are undertaken by TMC.

[3] Plaintiff alleges Frank White, Jr. is the Jackson County Executive, and he is sued in his official capacity.

[4] Plaintiff alleges Bridgette Shaffer is the Jackson County Health Director, and she is sued in her official capacity.

[5] Plaintiff alleges Troy M. Schulte is the Jackson County Administrator and Emergency Management Coordinator, and he is sued in his official capacities.

disease 2019 (COVID-19). Plaintiff's Complaint refers to these emergency public health orders as the "Plan," which includes such orders "starting from the Stay at Home Order, continuing with the Phase 1 Plan, Phase 2.5, orders to effectuate future phases of the Plan, and Defendants' criteria, guidance, interpretations, and policies related to the Plan." Plaintiff alleges these "constitute a unified set of laws, orders, guidance, interpretations and policies, responding to the same health emergency." Plaintiff alleges Defendants White, Schulte, and Shaffer acting on behalf of TMC as operator of the Health Department, claim undifferentiated authority to issue orders constituting the Plan, and so are legally responsible for the Plan.

### A.    Stay at Home Order

Abundant Life alleges Defendants issued a "Stay at Home" Order on March 24, 2020, which was amended on April 16, 2020. The Stay at Home Order generally directed "nonessential" businesses within the county to shut down and prohibited unauthorized gatherings outside single households. The Stay at Home Order did not include houses of worship in the "essential" business category. The Stay at Home Order imposed less harsh rules on essential businesses than those imposed on nonessential businesses. Under this Order Plaintiff was prohibited from holding worship services.

### B.    Phase 1 Order

On May 11, 2020, the "Eastern Jackson County Recovery Plan Phase 1" ("the Phase 1 Order") became effective. Under the Phase 1 Order, essential businesses could open for business if they maintained social distancing and preventative practices and had a social distancing protocol. Retail stores could open if they limited the number of people allowed into the building to specified percentages of the facility occupancy limit, maintained social distancing and implemented preventative practices, and had a social distancing protocol. Personal services (e.g. salons) were to follow the same rules to be open for business by appointment only. Entertainment venues, gyms and fitness centers, outdoor playgrounds, and sports courts were to remain closed. Large gatherings, including those at churches, funerals, and weddings, were limited to ten people, were to maintain social distancing and preventative practices, and could be held as drive-in services with social distancing. Restaurants and bars selling food were able to allow dining in, but curbside and pickup were encouraged. Restaurants and bars were to follow the same additional restrictions as retail stores and personal services businesses.

2

Plaintiff alleges the Phase 1 Order applied rules to it based on the religious motivation for a gathering and not on objective, measurable safety criteria, and treated religious groups unequally based on geography in that Kansas City, Missouri's rules applied in parts of western Jackson County, Missouri and were more generous to churches than the Phase 1 Order's rules.

### C. Amended Phase 1 Order

After Defendants were served this lawsuit, an Amended Phase 1 Order and brochure were issued, dated May 12, 2020, and received by Plaintiff May 14, 2020.[6]  The Amended Phase 1 Order subjected church gatherings to substantially the same limits as "non-essential businesses that are frequented by the public," and churches were not designated as "essential" organizations. The Amended Phase 1 Order subjected commercial businesses to less restrictive rules.  The Amended Phase 1 Order subjected Plaintiff to rules based on Plaintiff's religious status or motivation, not safety criteria, and allowed different rules in Kansas City, Missouri than in eastern Jackson County, Missouri.

### D. Phase 2 Order

Phase 2 of the Plan was effective beginning June 1, 2020.  Under the Phase 2 Order, places of worship could gather at "50% of the lowest occupancy load on the certificate of occupancy of the room or facility (whichever is lower) in which the gathering is occurring.  This is only permissible as long as adequate social distancing (6 feet) can be maintained."  The brochure regarding Phase 2 also showed rules for Phase 3, under which Plaintiff could gather at 75 percent capacity, but did not provide a date for implementation.  The rules of the Phase 2 and Phase 3 Orders continued to offer less restrictive rules to other non-religious gatherings, particularly "essential" commercial operations, and limited Plaintiff based on religious motivation or status rather than measurable safety criteria.

### E. Phase 2.5 Order

On July 1, 2020, Defendant Shaffer issued the Phase 2.5 Order on behalf of the Health Department operated by TMC, and in her capacity as director of the Jackson County Health Department.  Defendants Shaffer, the Health Department, and TMC ordered Plaintiff to exclude people without masks under penalty of law for both Plaintiff and worshipers without regard to modifications or accommodations under the Phase 2.5 order, which Plaintiff does not wish to do.

---

[6] All referenced versions of the Plan were attached to the Complaint as exhibits except for the May 14, 2020 version.

Phase 2.5 continued to offer less restrictive rules for "essential" businesses, "penaliz[ing]" religiously motivated gatherings differently than other, non-religiously motivated gatherings. Phase 2.5 limited outdoor religious gatherings to 100 people, not counting employees, which would have prevented Plaintiff from offering "car church" services as alternatives to indoor worship services. The Phase 2.5 Order did not require organizations to enforce the face covering requirements. TMC in its operations of the Health Department did issue posters on July 1, 2020, which claimed businesses had a duty to enforce the Order, as well as issuing business guidance which claimed to require a business to post signs concerning masks, to enforce the face covering mandate in the business, and to ask all customers two County-mandated questions. TMC, through its operations of the Health Department, threatened that "[f]ailure to enforce the face covering mandate within the confines of the business may result in a notice of non-compliance which is punishable by fine, imprisonment, or both."

## F. The Amended Phase 2.5 Order

On October 2, 2020, Defendants issued a new, Amended Phase 2.5 Order, signed by Defendants White, Shaffer, and Schulte, and a new Recovery Plan brochure. The Amended Phase 2.5 Order delegated authority to Defendant Shaffer to "extend[], rescind[], supersede[], or amend[]" the Order. The Amended Phase 2.5 Order defined "gatherings" to include "religious services" and imposed a permission-based system for gatherings of more than 100 people, requiring them to submit a gathering protocol at least 72 business hours in advance of the event to be approved by Jackson County and made easily accessible to all attendees. The gathering protocol required churches to list all dates and times of their events and upload plans, diagrams, seating charts, and other materials relevant to their events. Churches had to follow all the listed measures in the document and seek permission to gather. Approval could be revoked at any time with possible punitive action for failure to comply with Jackson County Health Department orders. The gathering protocol document listed no requirements for the basis of the County's approval or disapproval of a particular gathering. The gathering protocol mandated that gatherings must adhere to the guidance found in the Recovery Plan. The Recovery Plan made no reference to the gathering protocol for essential businesses but referenced the gathering protocol for nonessential businesses and for churches.

### G. The Current Order

The Court notes that the Plan has been amended again multiple times between the briefing of this motion and the entry of this order, and the latest Health Order available on the Jackson County Health Department website at the time of the drafting of this order was entered May 14, 2021 (Health Order, Eff. 5/14/2021, accessed 5/17/2021 at https://jacohd.org/covid-health-order). The Court may consider this Order in ruling on these motions to dismiss, as it is a matter of public record. *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011). Under the May 14, 2021 Order ("current version of the Plan"), churches or houses of worship are not mentioned specifically and no distinction between the treatment of churches and any business or indoor space is noted. The current version of the Plan states the Health Department "will continue to make recommendations consistent with CDC guidelines, taking into consideration infection and vaccination rates in the County and all other information relevant to keeping the community safe."

### H. Plaintiff's Alleged Harms Under Each Phase of the Plan

From March 24, 2020, under the Plan, orders to effectuate the Plan, criteria, guidance, interpretations, policies and practices, Plaintiff alleges its religious exercise has been burdened. Plaintiff alleges it has been forced to cancel or turn away persons from services of corporate worship and to reduce ministry to members and the public or use less effective methods such as internet streaming services. Plaintiff alleges it has been unable to operate or employ its staff consistent with its beliefs and activities. The Plan has also rendered Plaintiff unable to use its employees and its property to offer and provide physical and spiritual help, including, without limitation, preaching, corporate prayer, and other corporate worship to all who seek it.

From June 1, 2020, Plaintiff alleges it was harmed by the Plan, being required to limit its occupancy to 50 percent of the occupancy load based on its construction documents. On August 28, 2020, Plaintiff received a "Notice of Non-Compliance," from Defendants Jackson County, Shaffer, and Schulte, alleging that Plaintiff had not enforced the order with employees or customers. The Notice ordered Plaintiff to ask specific questions to people not wearing a mask and told Plaintiff that "the business may still refuse the person entry." The Notice also stated that violation of "this Order" was a Class A Misdemeanor under § 192.320, RSMo., and "punishable by fine, imprisonment, or both including the possible suspension of your business license."

Plaintiff alleges the Phase 1 Order says restrictions are likely to return if there is any recurrence of coronavirus infections: "It is possible to return to a more stringent phase if key

criteria are not met or if there is a spike in hospitalizations or deaths. Each phase will last a minimum of 14-days - consistent with the incubation period of SARS-CoV-2."

## II. PROCEDURAL POSTURE

Plaintiff's Complaint alleges the Plan, in all it phases, (I) violates the Free Exercise of Religion Clause of the First Amendment to the United States Constitution, both facially and as applied, (II) violates the First Amendment to the United States Constitution's protection of Freedom of Speech, both facially and as applied, (III) violates the First Amendment to the United States Constitution's protection of Freedom of Assembly and Association, (IV) violates the First Amendment to the United States Constitution's Establishment Clause, (V) violates the Religious Land Use and Institutionalized Persons Act's ("RLUIPA") Substantial Burden Provision (42 U.S.C. §2000cc), (VI) violates RLUIPA's Equal Terms Provision, (VII) violates RLUIPA's Unreasonable Limitations Provision, (VIII) violates Missouri's Religious Freedom Restoration Act (§ 1.302, RSMo.) ("RFRA"), (IX) violates the Missouri Constitution, Article I, Sections 2, 5, 9, and 10, and (X) is invalid under §§ 192.300 and 192.320 of the Revised Statutes of Missouri. Plaintiff requests declaratory and injunctive relief as to the Plan's allegedly unconstitutional and invalid restrictions and mandates, as well as costs, attorney's fees, and nominal damages for constitutional violations.

Defendants Jackson County, White, and Schulte ("County Defendants") now bring a motion to dismiss Plaintiff's Complaint ("MTD1") as do Defendants Health Department, Shaffer, and TMC ("Health Department Defendants") ("MTD2"), both motions arguing dismissal is warranted based on lack of subject matter jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6).

## III. STANDARD

Dismissal of an action is appropriate if the court does not have subject matter jurisdiction over a claim. *Croyle by & through Croyle v. United States*, 908 F.3d 377, 380 (8th Cir. 2018); Fed. R. Civ. P. 12(b)(1). "Subject matter jurisdiction refers to the court's power to decide a certain class of cases." *LeMay v. U.S. Postal Serv.*, 45 F.3d 797, 799 (8th Cir. 2006). Federal courts are courts of limited jurisdiction and cannot hear a claim unless specifically authorized by the Constitution or a federal statute. *Rasul v. Bush*, 542 U.S. 466, 489 (2002). When reviewing a motion to dismiss pursuant to Rule 12(b)(1), the Court must accept all well-pled factual allegations in the complaint as true, draw all inferences in favor of the non-moving party, and dismiss the

action only if the complaint fails to allege a necessary element for subject matter jurisdiction. *Young Am. Corp. v. Affiliated Computer Servs., Inc.*, 424 F.3d 840, 843-44 (8th Cir. 2005).

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to file a motion to dismiss a party's claims for "failure to state a claim upon which relief can be granted[.]" To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court "accept[s] the allegations contained in the complaint as true and draw[s] all reasonable inferences in favor of the nonmoving party." *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 861 (8th Cir. 2010) (quotation marks and citation omitted). "In addressing a motion to dismiss, [t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig*, 652 F.3d at 976 (internal quotation marks omitted).

## IV. ANALYSIS

County Defendants now move to dismiss Plaintiff's Complaint, arguing that on November 18, 2020, an Amended Order was entered,[7] and the bulk of Plaintiff's Complaint, which makes allegations relating to previous Plans, is therefore moot. MTD1 argues that dismissal is warranted for lack of subject matter jurisdiction under Rule 12(b)(1) because Plaintiff's declaratory judgment claim is speculative. MTD1 further asserts dismissal is warranted under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted on the following grounds: (1) governmental officials named in their official capacity should be dismissed as redundant; (2) Plaintiff's Complaint fails to allege the Amended Order lacks a real and substantial relation to the COVID-19 pandemic; (3) the Amended Order is neutral and generally applicable and places no restrictions on religious exercise; (4) RLUIPA restricts regulations on land use, not conduct regulations, and therefore does not apply to the Plan, which is a regulation governing conduct; and finally, (5) invalidity under sections 192.300 and 192.320, RSMo. is not a cognizable cause of action.

---

[7] References to the Amended Order of November 18, 2020, in the remainder of this Order are due to this being the current order at the time the motions to dismiss were filed and accordingly the order upon which the arguments in the motions were based.

Health Department Defendants also move to dismiss Abundant Life's complaint, similarly arguing dismissal is warranted based on lack of subject matter jurisdiction under Rule 12(b)(1) on the grounds of mootness and the speculative nature of Plaintiff's claim for declaratory judgment. MTD2 likewise argues dismissal is appropriate due to failure to state a claim under Rule 12(b)(6) on the following grounds: (1) claims against Defendant Shaffer are redundant; (2) claims for violation of the First Amendment are conclusory, unsupported by facts, inconsistent with the plain language of the Plan, and fail to plead the Plan is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law[;]" (3) RLUIPA restricts land use regulations, not conduct regulations like the Plan; (4) Plaintiff's RFRA claim makes only broad, conclusory allegations not entitled to the presumption of truth, the Plan no longer contains the distinctions between essential and non-essential businesses' restrictions, and even if it did they were neutral and of general application; (5) Plaintiff's claim for violation of the Missouri Constitution relies on conclusory allegations not entitled to the presumption of truth; and (6) "Invalidity Under RSMo. § 192.300, § 192.320" is not a cognizable claim under Missouri law and this claim is devoid of factual allegations in support.

The arguments of both motions to dismiss are substantially similar and so are addressed jointly. For ease of reading, the arguments applying to the Complaint as a whole are addressed first, followed by the arguments as they apply to each count of the Complaint.

### A.    Mootness

"Article III's case-or-controversy requirement subsists through all stages of federal judicial proceedings.... [I]t is not enough that a dispute was very much alive when suit was filed." *Fed. Election Comm'n v. Wis. Right To Life, Inc.*, 551 U.S. 449, 461 (2007) (internal quotation marks omitted). On this basis, Defendants argue in their motions to dismiss that Plaintiff's Complaint is moot because the Amended Order entered November 18, 2020, does not restrict or impose the limitations alleged by Plaintiff and thus constitutes changed circumstances already providing the requested relief and eliminating the need for court action. They argue that the Amended Order remedies all of the alleged burdens and purported discrimination at issue in the Complaint, so the Plaintiff no longer has a cognizable interest in the outcome of this litigation.

Supreme Court precedent, however, makes clear that this matter is not moot. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). Rather, it "fits comfortably within the established exception to mootness for disputes capable of repetition, yet evading

review," which "applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Wis. Right To Life, Inc.*, 551 U.S. at 462 (internal quotation marks omitted). Here, as in *Roman Catholic Diocese of Brooklyn*, Defendants "regularly change[] the [Plan] without prior notice." 141 S. Ct. at 68. Thus, Plaintiff's claims calling for injunctive relief are still live "because the [Plaintiff] remain[s] under a constant threat that" Defendants will place a prior or similarly restrictive version of the Plan into effect. *Id.* at 68 (citing with approval *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." (internal quotation marks omitted)).

Specifically, Plaintiff alleges the Phase I Order says restrictions are likely to return if there is any recurrence of coronavirus infections: "It is possible to return to a more stringent phase if key criteria are not met or if there is a spike in hospitalizations or deaths." The Court also notes that the current version of the Plan indicates "The County will consistently monitor data regarding COVID-19 rates in Jackson County and reserves the right to enter a subsequent Health Order in accordance with infection rates, CDC guidelines, and any other relevant information which indicates the necessity to increase restrictions." (Health Order, Eff. 5/14/2021.) Moreover, Plaintiff addresses its claims at "the Plan," and although the Complaint does not specifically name the Amended Order of November 18, 2020, it defines "the Plan" referenced throughout the Complaint as consisting of the emergency public health orders issued by Defendants in response to the threat posed by COVID-19, including such orders "starting from the Stay at Home Order, continuing with the Phase 1 Plan, Phase 2.5, orders to effectuate *future* phases of the Plan, and Defendants' criteria, guidance, interpretations, and policies related to the Plan." (emphasis added).

Accordingly, Plaintiff's Complaint is not subject to dismissal for lack of subject matter jurisdiction on the ground of mootness.

### B. Individual Defendants Sued in their Official Capacity

Defendants argue Plaintiff's claims against the individual defendants sued in their official capacities should be dismissed as redundant. Plaintiff argues the case cited by County Defendants for their argument is distinguishable in that it is part of a line of cases in which the Eighth Circuit has dismissed employees where the only relief available comes from an already-named government employer. Plaintiff argues some statutes, including RLUIPA, authorize relief against

9

individual officials as well as government, so suits against those individuals can proceed as long as relief is available. Plaintiff further argues that the record in this case does not show that the individual defendants are functionally redundant because the Plan names various powers and offices, and so it is not clear that an injunction against Jackson County or the Health Department covers all the authorities behind the Plan.

The Eighth Circuit reasoned in *Baker v. Chisom* that "[a] suit against a government official in his or her official capacity is 'another way of pleading an action against an entity of which an officer is an agent.'" 501 F.3d 920, 925 (8th Cir. 2007) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). The *Baker* court went on to explain, "[t]he real party in interest in an official-capacity suit is the governmental entity and not the named official. The doctrine of res judicata bars a plaintiff from suing a succession of public officials on the same official-capacity claim." *Id.* (internal quotation marks and citation omitted). Nothing in the cited authority limits this principle to cases where the only relief available comes from an already-named government employer. Moreover, for the reasons discussed in the below analysis of Plaintiff's RLUIPA claims, that Act does not save Plaintiff's claims against the individual defendants sued in their official capacities.

Accordingly, the Court dismisses the official-capacity claims against Defendants White, Shaffer, and Schulte.

## C. Declaratory Judgment

Defendants assert that Plaintiff's prayer for declaratory relief to prevent restrictions from being imposed in the future is a speculative allegation that is insufficient to establish a case or controversy.

"'A declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of *some future conduct*, not simply to proclaim liability for a past act.'" *Rogers v. Gaston*, No. 6:19-03346-CV-RK, 2020 WL 1694796, at *6 (W.D. Mo. Apr. 7, 2020) (quoting *Justice Network Inc. v. Craighead Cty.*, 931 F.3d 753, 764 (8th Cir. 2019)). To determine whether a request for declaratory relief is moot, the Court must decide "whether the facts alleged show a substantial controversy '*of sufficient immediacy and reality to warrant the issuance of a declaratory judgment*.'" *Id.* (quoting *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975)). To show a case or controversy meeting the Article III standing requirement as to declaratory relief, a plaintiff is required to "allege facts from which it appears there is a substantial likelihood that he will suffer

injury in the future." *Id.* (internal quotation marks omitted). "In a case of this sort, where the plaintiff[] seek[s] declaratory and injunctive relief, past injuries alone are insufficient to establish standing. Rather, [the plaintiff] must show he is suffering an ongoing injury or faces an immediate threat of injury." *Frost v. Sioux City, Iowa*, 920 F.3d 1158, 1162 (8th Cir. 2019) (internal quotation marks omitted).

Plaintiff's Complaint seeks declarations that Plaintiff's corporate worship services are a religious exercise; that Defendant's Plan, orders to effectuate the Plan, criteria, guidance, interpretations, policies and practices are facially unconstitutional in that they single out religious activity for disparate and unfair treatment, are unconstitutional as applied to Plaintiff, its members, employees, and guests, in violation of the First and Fourteenth Amendments to the U.S. Constitution, under the circumstances described in the amended complaint; violate RLUIPA, including the sections regarding substantial burden, discrimination, equal terms, or unreasonable Limitations; violate Missouri's RFRA; violate the Missouri Constitution, Article I, §§ 2, 5, 9, and 10; and violate RFRA, § 1.302, et seq.; and that violations of the Orders do not constitute violations of §§ 192.300 and 192.320, RSMo.

To the extent Plaintiff seeks declaratory relief for past violations under prior versions of the Plan, these past injuries are insufficient to establish standing, and such claims are therefore dismissed. However, to the extent Plaintiff has alleged facts from which it appears there is a substantial likelihood it will suffer injury in the future, Plaintiff has shown a case or controversy meeting the Article III standing requirement. Specifically, the allegations discussed above in the section analyzing mootness are similarly relevant to the Court's determination that Plaintiff's claims for declaratory relief from future constitutional and statutory violations are not so speculative as to be insufficient to establish a case or controversy, as argued by Defendants in their motions to dismiss. Accordingly, Plaintiff's request for declaratory relief from future constitutional and statutory violations is not subject to dismissal for lack of subject matter jurisdiction.

### D. First Amendment Claims

In its first four counts, Plaintiff alleges the Plan violates various rights under the First Amendment to the United States Constitution. Defendants acknowledge that under ordinary circumstances, governmental restrictions burdening religious practice that are not "neutral" or of "general applicability" must satisfy strict scrutiny, meaning they must be "narrowly tailored" to

serve a "compelling" governmental interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *Roman Catholic Diocese*, 141 S. Ct. at 66-67 (applying strict scrutiny to regulations that singled out houses of worship for especially harsh treatment). Immediately thereafter, however, and citing pre-*Roman Catholic Diocese* cases from lower courts, Defendants argue that a more deferential standard should be applied when evaluating the disputed Plan, because the COVID-19 pandemic is not an ordinary circumstance.

Specifically, Defendants argue that the appropriate standard is the deferential approach to governmental restrictions illustrated in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), which was applied in the above-mentioned pre-*Roman Catholic Diocese* cases. *Jacobson* held that "in the context of a public health crisis, a state action is susceptible to constitutional challenge only if it, 'purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law[.]'" *In re Rutledge*, 956 F.3d 1018, 1027-28 (8th Cir. 2020) (quoting *Jacobson*, 197 U.S. at 31). As detailed more fully below, in light of the Supreme Court's recent application of traditional tiers of constitutional scrutiny in *Roman Catholic Diocese* and further explained in *Tandon v. Newsom*, No. 20A151, 2021 WL 1328507, at *1 (U.S. Apr. 9, 2021), the Court concludes that *Jacobson* does not replace the traditional tiers of constitutional scrutiny. Accordingly, the traditional tiers of constitutional scrutiny are applied here.

### 1. Free Exercise

Count I of the Complaint claims the Plan violates Plaintiff's rights under the Free Exercise of Religion Clause of the First Amendment to the United States Constitution, both facially and as applied.

The First Amendment to the United States Constitution provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." "The Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (quoting *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 533). A law may not discriminate against "some or all religious beliefs" or "regulate or outlaw conduct because it is religiously motivated." *Id.* at 2021 (internal quotation marks omitted). If a law "is neutral and of general

applicability . . . then the law need only survive rational basis review—even if it 'has the incidental effect of burdening a particular religious practice.'" *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1232 (9th Cir. 2020) (quoting *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531).

As to Free Exercise claims, the Ninth Circuit aptly described this area of law as having recently experienced a "seismic shift" with the United States Supreme Court's decision in *Roman Catholic Diocese*, 141 S. Ct. 63. *Calvary Chapel Dayton Valley*, 982 F.3d at 1232. In relevant part, the Ninth Circuit wrote:

> In *Roman Catholic Diocese*, two houses of worship sought an injunction pending their appeal in the Second Circuit from the Supreme Court, seeking relief from an Executive Order issued by the Governor of New York that addressed the spread of COVID-19 in the state. That order imposed "restrictions on attendance at religious services in areas classified as 'red' or 'orange' zones." *Id.* at 66. In red zones, religious service attendance was capped at 10 people, and in orange zones, it was capped at 25. *Id.* In both zones, however, the order provided that essential businesses could "admit as many people as they wish[ed]." *Id.* at 66. The Court did not provide an exhaustive list of businesses deemed "essential," but did note that "acupuncture facilities, camp grounds, garages, . . . plants manufacturing chemicals and microelectronics[,] and all transportation facilities" were included. *Id.* Moreover, in orange zones, even "non-essential businesses [could] decide for themselves how many persons to admit." *Id.*
>
> The Court ultimately concluded that the houses of worship had shown a likelihood of success on the merits. *Id.* at 65-66. The challenged executive order, the Court held, "violate[d] 'the minimum requirement of neutrality' to religion." *Id.* (quoting *Church of Lukumi*, 508 U.S. at 533, 113 S.Ct. 2217). Under the Court's reasoning, the New York order was not neutral because it "single[d] out houses of worship for especially harsh treatment." *Id.* For example, "a large store in Brooklyn ... could literally have hundreds of people shopping there on any given day," whereas "a nearby church or synagogue would be prohibited from allowing more than 10 or 25 people inside for worship service." *Id.* at 67 (internal quotations omitted). The Court held that this "disparate treatment" of religion rendered the COVID-19 restrictions in the order not neutral or generally applicable. *Id. But see Church of Lukumi*, 508 U.S. at 533, 113 S.Ct. 2217; *Smith*, 494 U.S. at 878, 110 S.Ct. 1595.
>
> Applying strict scrutiny review to the New York order, the Court held that "[s]temming the spread of COVID-19 is unquestionably a compelling interest," but concluded the challenged order was not narrowly tailored. *Roman Catholic Diocese*, 141 S.Ct. at 66-67. The Court reasoned that "[n]ot only is there no evidence that the [two houses of worship] have contributed to the spread of COVID-19[,] but there were many other less restrictive rules that could be adopted to minimize the risk to those attending religious services," emphasizing that the New York restrictions are "far more severe than has been shown to be required to prevent the spread of the virus." *Id.* For example, New York could have tied maximum attendance at a religious service "to the size of the church or synagogue."

13

*Id.* Because the COVID-19 restrictions in the order did not survive strict scrutiny—and the houses of worship satisfied the other *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), factors—the Court preliminarily enjoined the "enforcement of the Governor's severe restrictions on the [houses of worship's] religious services." *Id.* at 69.

*Calvary Chapel Dayton Valley*, 982 F.3d at 1232–33.

The Supreme Court later distilled these concepts into clear rules arising in the context of COVID-19 restrictions:

First, government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise. *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 592 U. S. ——, —— – ——, 141 S.Ct. 63, 67-68, 208 L.Ed.2d 206 (2020) (*per curiam*). It is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue. *Id.*, at —— – ——, 141 S.Ct., at 66-67 (KAVANAUGH, J., concurring)

Second, whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue. *Id.*, at ——, 141 S.Ct., 67(*per curiam*) (describing secular activities treated more favorably than religious worship that either "have contributed to the spread of COVID–19" or "could" have presented similar risks). Comparability is concerned with the risks various activities pose, not the reasons why people gather. *Id.*, at ——, 141 S.Ct., at 66 (GORSUCH, J., concurring)

Third, the government has the burden to establish that the challenged law satisfies strict scrutiny. To do so in this context, it must do more than assert that certain risk factors "are always present in worship, or always absent from the other secular activities" the government may allow. *South Bay United Pentecostal Church* v. *Newsom*, 592 U. S. ——, ——, 141 S.Ct. 716, 718, —— L.Ed.2d —— (2021) (statement of GORSUCH, J.); *id.*, at ——, 141 S.Ct., at 717(BARRETT, J., concurring). Instead, narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID. Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied. Otherwise, precautions that suffice for other activities suffice for religious exercise too. *Roman Catholic Diocese*, 592 U. S., at —— – ——, 141 S.Ct., at 69-70; *South Bay*, 592 U. S., at ——, 141 S.Ct., at 719 (statement of GORSUCH, J.)

Fourth, even if the government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case. And so long as a case is not moot, litigants otherwise entitled to emergency injunctive relief remain entitled to such relief where the applicants "remain under a constant threat" that

14

government officials will use their power to reinstate the challenged restrictions. *Roman Catholic Diocese*, 592 U. S., at ——, 141 S.Ct., at 68; see also *High Plains Harvest Church* v. *Polis*, 592 U. S. ——, 141 S.Ct. 527, 208 L.Ed.2d 503 (2020).

*Tandon*, 2021 WL 1328507, at *1.

Here, Plaintiff's Complaint alleges under prior versions of the Plan, religiously motivated gatherings were restricted while commercially motivated gatherings could meet under less restrictive rules. MTD1 asserts Plaintiff's Complaint fails to allege the Amended Order lacks a real and substantial relation to the COVID-19 pandemic and that the Amended Order is neutral, generally applicable, and places no restrictions on religious exercise. MTD2 contends Plaintiff's claims for violation of the First Amendment should be dismissed as conclusory, unsupported by facts, inconsistent with the plain language of the Plan, and failing to plead the Plan is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."

Under the Free Exercise rationale of *Roman Catholic Diocese* and the clear rules explained in *Tandon v. Newsom*, however, Plaintiff's allegations sufficiently establish that prior versions of the Plan "violate 'the minimum requirement of neutrality' to religion." *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 66 (2020) (quoting *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 533); *Tandon*, 2021 WL 1328507, at *1. The versions of the Plan under which there was a numerical cap or any distinct restriction, i.e. the gathering protocol, applicable to houses of worship or churches that did not apply to secular activities, "cannot be viewed as neutral because they single[d] out houses of worship for especially harsh treatment." *Id.*[8] Under the rationale of *Roman Catholic Diocese*, these prior versions were not neutral and were not generally applicable, so analysis of whether they violate the First Amendment's protection of the Free Exercise of religion requires them to "satisfy 'strict scrutiny,' and this means that they must be 'narrowly tailored' to serve a 'compelling' state interest." *Id.* at 67 (quoting *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 546, 113 S.Ct. 2217).

---

[8] Justice Sotomayor's dissent in *Roman Catholic Diocese* noted the Supreme Court's "change of heart" from two earlier cases before the Court dealing with COVID-19 related restrictions, *South Bay United Pentecostal Church v. Newsom*, 590 U. S. ——, 140 S.Ct. 1613 (2020); *Calvary Chapel Dayton Valley v. Sisolak*, 591 U. S. ——, 140 S.Ct. 2603 (2020), which Justice Sotomayor observed "provided a clear and workable rule to state officials seeking to control the spread of COVID–19: They may restrict attendance at houses of worship so long as comparable secular institutions face restrictions that are at least equally as strict." *Roman Cath. Diocese*, 141 S. Ct. at 79 (Sotomayor, J., dissenting).

15

Here Plaintiff sufficiently alleges the ten-person restriction found in earlier versions of the Plan does not meet that standard. Plaintiff also sufficiently alleges the gathering protocol fails to meet constitutional muster under the same rationale.

The current version of the Plan, however, does not differentiate between churches and other businesses or indoor spaces. Therefore, to survive a motion to dismiss, Plaintiff must allege the current version of the Plan is not rationally related to a legitimate state interest. *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531 (A restriction that is neutral and generally applicable "need only survive rational basis review—even if it 'has the incidental effect of burdening a particular religious practice."); *Tandon*, 2021 WL 1328507, at *1. The Court finds Plaintiff fails to allege the current version of the Plan violates the Free Exercise clause of the First Amendment under rational basis review.

Accordingly, to the extent Plaintiff claims prior versions of the Plan violated the First Amendment's Free Exercise Clause under the strict scrutiny standard and seeks injunctive and declaratory relief, as well as nominal damages,[9] these claims survive Defendants' motions to dismiss. To the extent Plaintiff's Complaint can be construed as claiming the current version of the Plan violates the First Amendment's Free Exercise Clause, Plaintiff fails to allege the current version of the Plan is not rationally related to a legitimate state interest, and such claim is therefore dismissed.

## 2. Free Speech

In Count II Plaintiff challenges the Plan as violative of the First Amendment to the United States Constitution's protection of Freedom of Speech, both facially and as applied. Count II claims the Plan singles out certain religious activity for less favorable treatment than other, similarly situated, non-religious activities. Count II contends Defendant White stated he intended

---

[9] "[A] request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021). The *Uzuegbunam* court made clear that its holding was

> not to say that a request for nominal damages guarantees entry to court. Our holding concerns only redressability. It remains for the plaintiff to establish the other elements of standing (such as a particularized injury); plead a cognizable cause of action; and meet all other relevant requirements. We hold only that, for the purpose of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right.

*Id.* (internal citation omitted).

public pressure to "force" businesses to comply with the Plan, which would have a chilling effect on the targeted speech, including Plaintiff's. Count II asserts the Plan appears to give government officials unbridled discretion with respect to enforcement of the Order and the imposition of penalties, and to determine whether gatherings and activities are to be classified as "essential" or "house of worship" or "church" activities, making the Plan susceptible to both content and viewpoint-based discrimination. The Plan's definitions of "church" and the restrictions applied to churches are challenged as resting on prejudicial or stereotyped understandings of religious services, and not on the safety of the facility or activities within those facilities. Count II further alleges Defendants can use alternative, less restrictive means to achieve any interest that it might have, as evidenced by the exemption allowed to "essential" services.

Defendants' motions to dismiss argue Plaintiff's Free Speech claim should be dismissed because under the Amended Order it is moot and because the claim is conclusory and inconsistent with the plain language of the Plan, which applied to all large gatherings and was more limiting to other secular gatherings and events than to churches, and because the Plan meets the standard in *Jacobson*.

The First Amendment to the United States Constitution prohibits laws "abridging the freedom of speech." "It is well established that '[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests' under strict scrutiny." *Hand v. Beach Ent. KC, LCC*, 425 F. Supp. 3d 1096, 1114 (W.D. Mo. 2019) (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)). A content-based regulation "'applies to particular speech because of the topic discussed or the idea or message expressed.'" *Id.* (quoting *Reed*, 576 U.S. at 163). "A facially content-based speech regulation 'defin[es] regulated speech by particular subject matter,' and is subject to strict scrutiny regardless of the government's purpose in enacting the restriction." *Id.* (quoting *Reed*, 576 U.S. at 163). "Other restrictions more subtly 'defin[e] regulated speech by its function or purpose' or while appearing facially content-neutral, 'cannot be justified without reference to the content of the regulated speech.'" *Id.* (quoting *Reed*, 576 U.S. at 163-64). Such restrictions are also content-based and are therefore subject to strict scrutiny. *Id.*

Here, Plaintiff alleges prior versions of the Plan single out certain religious activity for less favorable treatment than other, similarly situated, non-religious activities, and Defendants can use

17

alternative, less restrictive means to achieve any interest that it might have, as evidenced by the exemption allowed to "essential" services. The current version of the Plan, however, does not differ in its treatment of churches and any other indoor spaces. Therefore, to survive a motion to dismiss, Plaintiff must allege the current version of the Plan is not rationally related to a legitimate state interest. *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531; *Tandon*, 2021 WL 1328507, at *1. The Court finds Plaintiff fails to allege the current version of the Plan violates the Free Speech clause of the First Amendment under rational basis review.

Accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party, Plaintiff sufficiently pleads its claim that earlier versions of the Plan are not narrowly tailored to a compelling state interest thereby failing to meet the strict scrutiny constitutional standard governing content-based regulations.[10] *Reed*, 576 U.S. at 163. Therefore, Plaintiff's First Amendment Freedom of Speech claims as to the earlier versions of the Plan survive dismissal. To the extent Plaintiff's Amended Complaint can be construed as claiming the current version of the Plan violates the First Amendment's Free Speech Clause,

---

[10] "The principal inquiry in determining content neutrality, in speech cases . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "The government's purpose is the controlling consideration." *Id.* "'A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Hand*, 425 F. Supp. 3d at 1114 (quoting *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 864 F.3d 905, 914 (8th Cir. 2017)); *Ward v. Rock Against Racism*, 491 U.S. at 791. Content-neutral restrictions on speech "are subject to a lower, intermediate level of scrutiny." *Id.* at 1115. "A content-neutral regulation is constitutional if 'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'" *B.W.C. v. Williams*, No. 20-1222, 2021 WL 833285, at *2 (8th Cir. Mar. 5, 2021) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994)). This standard is satisfied if the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Turner Broad. Sys., Inc.*, 512 U.S. at 662.
Accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party, Plaintiff has sufficiently alleged that reducing the spread of COVID-19 would be achieved just as effectively absent the Plan's restrictions differentiating between churches and other categories, including essential businesses. Accordingly, Plaintiff sufficiently pleads its claim that earlier versions of the Plan, even if neutral, fail to meet the applicable constitutional standard governing content neutral regulations. *Turner Broad. Sys., Inc.*, 512 U.S. at 662. Therefore, Plaintiff's First Amendment Freedom of Speech claims as to the earlier versions of the Plan would also survive dismissal under the lower standard applicable to content-neutral restrictions.

Plaintiff fails to allege the current version of the Plan is not rationally related to a legitimate state interest, and such claim is therefore dismissed.

### 3. Assembly and Association

Count III claims the Plan is in violation of the First Amendment to the United States Constitution's protection of Freedom of Assembly and Association in that it burdens and interferes with Plaintiff's right to assemble and associate with its members, employees, and guests. Defendants argue Count III should be dismissed because it is devoid of factual allegations, and the Plan meets the standard of *Jacobson*.

The First Amendment to the United States Constitution guarantees that "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble." U.S. Const. amend. I. Individuals also have a constitutional freedom of association. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617 (1984).

Here, Plaintiff alleges various prior versions of the Plan prohibited Plaintiff from holding worship services at all, then such services were limited to ten people, and thereafter the Plan continued to offer less restrictive rules to other non-religious gatherings, particularly "essential" commercial operations, as well as limiting Plaintiff based on religious motivation or status rather than measurable safety criteria. The current version of the Plan, however, treats churches the same as all indoor spaces. Therefore, to survive a motion to dismiss, Plaintiff must allege the current version of the Plan is not rationally related to a legitimate state interest. *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531; *Tandon*, 2021 WL 1328507, at *1. The Court finds Plaintiff fails to allege the current version of the Plan violates the Freedom of Association and Assembly protected by the First Amendment under rational basis review.

Accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party, Plaintiff has sufficiently alleged that the Plan's restrictions prohibiting Plaintiff from holding worship services at all, limiting services to ten people, and offering less restrictive rules to other non-religious gatherings, and placing limitations on Plaintiff based on religious motivation or status rather than measurable safety criteria are not narrowly tailored to a compelling state interest. Therefore, Plaintiff sufficiently pleads its claim that earlier versions of the Plan fail to meet the strict scrutiny standard governing content-based

regulations. *Reed*, 576 U.S. at 163.[11]

Accordingly, Plaintiff's claim that the Plan violated its Freedom of Assembly and Association protected by the First Amendment to the United States Constitution survives Defendants' motions to dismiss. To the extent Plaintiff's Amended Complaint can be construed as claiming the current version of the Plan violates the First Amendment's protection of Freedom of Assembly and Association, Plaintiff fails to allege the current version of the Plan is not rationally related to a legitimate state interest, and such claim is therefore dismissed.

### 4. Establishment Clause

In Count IV, Plaintiff alleges the Plan violates the First Amendment to the United States Constitution's Establishment Clause by targeting and inhibiting religious activity, "as described above," and by Defendants' interpretation, policies and practices having demonstrated bias or hostility against Plaintiff's religious ministry. Defendants argue Count IV is devoid of supporting factual allegations, the conclusory allegations are not supported by the plain language of the Plan, and the Plan meets the standard of *Jacobson*.

"'The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.'" *Doe v. Parson*, 960 F.3d 1115, 1118 (8th Cir. 2020), cert. denied, No. 20-385, 2020 WL 6829080 (U.S. Nov. 23, 2020) (quoting *Larson v. Valente*, 456 U.S. 228, 244, (1982)). Another touchstone of Establishment Clause analysis is that the government must be neutral between religion and nonreligion. *McCreary Cty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844, 860 (2005).

Here, Plaintiff alleges the Plan treats religious groups unequally based on geography in that Kansas City, Missouri's rules apply in parts of western Jackson County and have been more generous to churches than the Plan. Plaintiff also alleges under prior versions of the Plan,

---

[11] As with Plaintiff's Freedom of Speech claim, accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party, Plaintiff also has sufficiently alleged that reducing the spread of COVID-19 would be achieved just as effectively absent the Plan's restrictions prohibiting Plaintiff from holding worship services at all, limiting services to ten people, offering less restrictive rules to other non-religious gatherings, and placing limitations on Plaintiff based on religious motivation or status rather than measurable safety criteria. Accordingly, Plaintiff sufficiently pleads its claim that earlier versions of the Plan, even if neutral, fail to meet the applicable constitutional standard governing content neutral regulations. *Turner Broad. Sys., Inc.*, 512 U.S. at 662. Therefore, Plaintiff's First Amendment Freedom of Assembly and Association claims as to the earlier versions of the Plan would also survive dismissal under the lower standard applicable to content-neutral restrictions.

religiously motivated gatherings were restricted while commercially motivated gatherings could meet under less restrictive rules. Accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party, Plaintiff has stated a claim that prior versions of the Plan show official preference for religious denominations in Kansas City, Missouri, over religious denominations in eastern Jackson County outside of Kansas City, Missouri, as well as not being neutral between religion and nonreligion, in violation of the Establishment Clause.

Accordingly, Plaintiff's claim that the Plan violated the Establishment Clause of the First Amendment to the United States Constitution survives Defendants' motions to dismiss. To the extent Plaintiff's Complaint can be construed as claiming the current version of the Plan violates the First Amendment's Establishment Clause, Plaintiff fails to allege the current version of the Plan is not rationally related to a legitimate state interest, and such claim is therefore dismissed.

E.    **Claims Under the Religious Land Use and Institutionalized Persons Act**

Count V of Plaintiff's Complaint challenges the Plan as violative of the Religious Land Use and Institutionalized Persons Act's ("RLUIPA") Substantial Burden Provision (42 U.S.C. §2000cc). Plaintiff alleges the Plan, orders to effectuate the Plan, criteria, guidance, interpretations, policies and practices of the Defendants constitute the imposition or implementation of a land use regulation. Plaintiff alleges this land use regulation imposes a substantial burden on the Plaintiff's religious exercise and is a burden that is neither in furtherance of a compelling governmental interest nor the least restrictive means of furthering such interest. Count VI claims the Plan violates RLUIPA's Equal Terms Provision in that it imposes or implements a land use regulation that treats Plaintiff as a church on less than equal terms with nonreligious assemblies or institutions, including, but not limited to, those institutions deemed "essential" by the Defendants. It also alleges Defendants have not applied the same interpretations, policies, or practices concerning "large gatherings and social events" to retail businesses, bars and restaurants that, in fact, are large gatherings of customers for commercial purposes. Count VII alleges the Plan is in violation of RLUIPA's Unreasonable Limitations Provision, in that Defendants' Plan, orders, criteria, guidance, interpretations, policies and practices as applied to Plaintiff operate as a land use regulation, and constitute an unreasonable limitation on the religious assembly and worship rights of Plaintiff. Plaintiff alleges the orders result in wildly inconsistent limits on churches in different parts of the same county for no legitimate or compelling reason.

21

RLUIPA limits the ability of state and local governments to "impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person." 42 U.S.C. § 2000cc(a)(1). RLUIPA defines "land use regulation" as "a zoning or landmarking law, or the application of such a law." 42 U.S.C. § 2000cc-5(5). Defendants argue that the Plan regulates conduct, not land use, and thus RLUIPA is not applicable and Plaintiff's claims thereunder fail.

This Court agrees with Defendants' characterization, also finding the rationale of *Cross Culture Christian Center v. Newsom*, 445 F. Supp. 3d 758, 771 (E.D. Cal. 2020) to be persuasive. Here, as in *Cross Culture*, "Plaintiff[] fail[s] to identify any cases where a court has upheld a challenge under this provision to a conduct-regulating statute." *Id.* "Indeed, interpreting RLUIPA to regulate conduct in this way would raise constitutional questions about the law's congruence and proportionality." *Id.* (citing *Guru Nanak Sikh Soc. Of Yuba City v. County of Sutter*, 456 F.3d 978, 986 (9th Cir. 2006) ("To avoid RFRA's fate, Congress wrote that RLUIPA would apply only to regulations regarding land use and prison conditions.")); *Cutter v. Wilkinson*, 544 U.S. 709 (2005)). "Employing the canon of constitutional avoidance, this Court finds RLUIPA, by its own terms, does not apply to the [Plan]." *Id.*

Therefore, Plaintiff's allegations involving violations of the RLUIPA fail to state a claim for which relief may be granted. Counts V, VI, and VII are dismissed.

### F. Missouri's Religious Freedom Restoration Act Claim

Count VIII challenges the Plan as violating RFRA (§ 1.302, RSMo.) in that Defendants' Plan, orders to effectuate the Plan, criteria, guidance, interpretations, policies and practices restrict Plaintiff's free exercise of religion and are not essential to any compelling governmental interests. Count VIII alleges the Plan restricting religiously motivated gatherings to ten persons was not a rule of general applicability, and discriminated against religion, or among religious groups elsewhere in the county, and among religious groups that believe regularly meeting in person is a Biblical, religious requirement. This Count alleges later versions of the Plan were not rules of general applicability because they excluded Plaintiff and its services from the "essential" category, and therefore discriminated against religion, or among religious groups elsewhere in the county, and among religious groups that believe regularly meeting in person is a Biblical, religious requirement. Defendants' motions to dismiss argue the claims of Count VIII fail because older versions of the Plan did not discriminate against religion or among religious groups, because the

22

distinctions between essential and non-essential businesses had obvious and inherent reasons having nothing to do with religion or religious beliefs, because the Plan in effect at the time of their motion (dated November 18, 2020) was neutral and generally applicable, because Plaintiff's allegations are broad and conclusory, and because the claims are mooted by the newer version of the Plan.

RFRA provides:

1. A governmental authority may not restrict a person's free exercise of religion, unless:

(1) The restriction is in the form of a rule of general applicability, and does not discriminate against religion, or among religions; and

(2) The governmental authority demonstrates that application of the restriction to the person is essential to further a compelling governmental interest, and is not unduly restrictive considering the relevant circumstances.

2. As used in this section, **"exercise of religion"** shall be defined as an act or refusal to act that is substantially motivated by religious belief, whether or not the religious exercise is compulsory or central to a larger system of religious belief.

3. As used in this section **"demonstrates"** means meets the burden of going forward with the evidence and of persuasion.

§ 1.302.1, RSMo Supp. 2013 (emphasis in original). To violate RFRA, the Plan must restrict Plaintiff's exercise of religion. *Doe v. Parson*, 567 S.W.3d 625, 630 (Mo. 2019). As discussed herein above, Plaintiff has adequately pleaded that prior versions of the Plan restricted its free exercise of religion, were not of general applicability, and discriminated against and or among religions (geographically and in shutting down churches entirely then applying harsher restrictions to churches than essential businesses).

Accordingly, Plaintiff's RFRA claims directed at prior versions of the Plan survive Defendants' motions to dismiss. To the extent Plaintiff's Complaint can be construed as claiming the current version of the Plan violates RFRA, Plaintiff fails to allege the current version of the Plan (1) restricts its free exercise of religion, (2) is not in the form of a rule of general applicability, (3) discriminates against religion or among religions; (4) application of the restriction to it is not essential to further a compelling governmental interest, and (5) is unduly restrictive considering the relevant circumstances. Plaintiff's RFRA claims as to the current version of the Plan, to the extent any can be construed from the Complaint, are therefore dismissed.

23

G.     **Missouri Constitutional Claims**

Count IX of the Complaint asserts the Plan is in violation of the Missouri Constitution, Article I, §§ 2, 5, 9, and 10, protecting Plaintiff's rights including the right to corporate worship and prayer on Plaintiff's private property, the right to worship God according to dictates of conscience, the right peaceably to assemble for the common good, the right to liberty, the right to due process, the right to equal protection, and other rights contained in the Missouri Constitution Bill of Rights.  Plaintiff alleges Defendants' Plan, orders, criteria, guidance, interpretations, policies and practices interpretations, policies and practices under the Plan have coerced, interfered with and substantially burdened the exercise of the foregoing rights.  Defendants' motions to dismiss argue Plaintiff's Missouri Constitutional claims should be dismissed because the Amended Order is neutral and generally applicable and because the allegations are conclusory with no factual allegations in support.

Article 1, § 2 of the Missouri Constitution provides:

That all constitutional government is intended to promote the general welfare of the people; that all persons have a natural right to life, liberty, the pursuit of happiness and the enjoyment of the gains of their own industry; that all persons are created equal and are entitled to equal rights and opportunity under the law; that to give security to these things is the principal office of government, and that when government does not confer this security, it fails in its chief design.

Under Missouri law, "[a]nalysis of an equal protection claim involves a two step process. The first step is to determine whether the classification burdens a 'suspect class' or impinges upon a 'fundamental right'; in either event, strict judicial scrutiny is required."  *Blaske v. Smith & Entzeroth, Inc.*, 821 S.W.2d 822, 829 (Mo. 1991).  "'Fundamental rights' include such things as freedom of speech, freedom of the press, freedom of religion, the right to vote and the right to procreate."  *Id.* (citing *State Bd. of Registration v. Griffin*, 651 S.W.2d 475, 479-80 (Mo. banc 1983)).  Under strict scrutiny "the [restriction] will be invalid unless it serves compelling state interests and is narrowly tailored to meet those interests."  *Glossip v. Mo. Dep't of Transp. & Highway Patrol Emps' Ret. Sys.*, 411 S.W.3d 796, 801 (Mo. 2013).

Article 1, § 5 of the Missouri Constitution provides, in relevant part:

That all men and women have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; that no human authority can control or interfere with the rights of conscience; . . . that to secure a citizen's right to acknowledge Almighty God according to the dictates of his or her own conscience, neither the state nor any of its political subdivisions shall establish any

24

official religion, nor shall a citizen's right to pray or express his or her religious beliefs be infringed; that the state . . . shall ensure that any person shall have the right to pray individually or corporately in a private or public setting so long as such prayer does not result in disturbance of the peace or disruption of a public meeting or assembly; that citizens as well as elected officials and employees of the state of Missouri and its political subdivisions shall have the right to pray on government premises and public property so long as such prayers abide within the same parameters placed upon any other free speech under similar circumstances; . . . but this section shall not be construed to . . . justify practices inconsistent with the good order, peace or safety of the state, or with the rights of others.

Article I, § 9 of the Missouri Constitution provides: "That the people have the right peaceably to assemble for their common good, and to apply to those invested with the powers of government for redress of grievances by petition or remonstrance."

Article I, section 10 of the Missouri Constitution provides: "That no person shall be deprived of life, liberty or property without due process of law." "'Under both the federal and state constitutions, the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'" *City of Creve Coeur v. Nottebrok*, 356 S.W.3d 252, 257 (Mo. Ct. App. 2011) (quoting *Jamison v. State, Dept. of Social Servs, Div. of Family Servs*, 218 S.W.3d 399, 405 (Mo. banc 2007)), overruled on other grounds by *Edwards v. City of Ellisville*, 426 S.W.3d 644 (Mo. Ct. App. 2013). "To determine what process is due in a particular case, the court first determines whether an individual has been deprived of a constitutionally protected liberty or property interest. If so, the court next examines whether the procedures leading to the deprivation of that interest were constitutionally sufficient." *Id.* (citing *Jamison*, 218 S.W.3d at 405).

Here, accepting as true Plaintiff's allegation that prior versions of the Plan interfered with and substantially burdened the exercise of its right to equal protection, and drawing all reasonable inferences in favor of Plaintiff, Count IX sufficiently states a claim that prior versions of the Plan violated Article I, § 2 of the Missouri Constitution. Accepting as true Plaintiff's allegation that prior versions of the Plan interfered with and substantially burdened the exercise of its right to corporate worship and prayer on Plaintiff's private property and the right to worship God according to dictates of conscience, and drawing all reasonable inferences in favor of Plaintiff, Count IX sufficiently states a claim that prior versions of the Plan violated Article I, § 5 of the Missouri Constitution. Accepting as true Plaintiff's allegation that prior versions of the Plan interfered with and substantially burdened the exercise of its right peaceably to assemble for the

common good, and drawing all reasonable inferences in favor of Plaintiff, Count IX sufficiently states a claim that prior versions of the Plan violated Article I, § 9 of the Missouri Constitution. Accepting as true Plaintiff's allegation that prior versions of the Plan interfered with and substantially burdened the exercise of its right to liberty and due process, and drawing all reasonable inferences in favor of Plaintiff, Count IX sufficiently states a claim that prior versions of the Plan violated Article I, § 10 of the Missouri Constitution.

Accordingly, Plaintiff's claim that prior versions of the Plan violated and violates Article I, §§ 2, 5, 9, and 10 of the Missouri Constitution survives Defendants' motions to dismiss. To the extent Plaintiff's Amended Complaint can be construed as claiming the current version of the Plan violates the Missouri Constitution, Plaintiff fails to allege the current version of the Plan is not rationally related to a legitimate state interest, and such claim is therefore dismissed.

### H. Claim of Invalidity of the Plan Under Sections 192.300 and 192.320, RSMo.

Count X claims the Plan is invalid under §§ 192.300 and 192.320 of the Revised Statutes of Missouri. Plaintiff alleges Defendants' Orders under the Plan claim that violations of the order are punishable under § 192.300, RSMo., which concerns orders by "County Commissions" and "County Health Center Boards," and § 192.320, RSMo. Plaintiff alleges none of the Orders issued under the Plan have been approved by the vote of the Jackson County Legislature, by a County Commission, or by a County Health Center Board. Defendants' motions to dismiss argue Plaintiff has failed to state a claim for "Invalidity Under RSMo. § 192.300, § 192.320" because it is not a cognizable claim under Missouri law and it is devoid of factual allegations in support.

Section 192.300, RSMo. provides, in relevant part, "[t]he county commissions and the county health center boards of the several counties may make and promulgate orders, ordinances, rules or regulations, respectively as will tend to enhance the public health and prevent the entrance of infectious, contagious, communicable or dangerous diseases into such county[.]" Section 192.320 provides that "[a]ny person or persons violating any of the provisions" including § 192.300, "shall be deemed guilty of a class A misdemeanor."

Accepting as true Plaintiff's allegation that none of the Orders issued under the Plan have been approved by the vote of the Jackson County Legislature, by a County Commission, or by a County Health Center Board, and drawing all reasonable inferences in favor of Plaintiff, Count X sufficiently states a claim that it is entitled to a declaration that the Plan is invalid under §§ 192.300 and 192.320 RSMo.

As such, Count X survives Defendants' motions to dismiss.

## IV. Conclusion

After careful review of the record, and for the reasons above, Plaintiff's Counts I, II, III, IV, VIII, and IX state claims upon which relief may be granted sufficient to survive Defendants' motions to dismiss as to prior versions of the Plan. Plaintiff's Count X states a claim upon which relief may be granted sufficient to survive Defendants' motions to dismiss. Conversely, Plaintiff's Counts I, II, III, IV, VIII, and IX fail to state claims upon which relief may be granted sufficient to survive Defendants' motions to dismiss as to the current version of the Plan. Plaintiff's Counts V, VI, and VII fail to state a claim upon which relief may be granted. Further, Plaintiff's claims against individual Defendants White, Shaffer, and Schulte, sued in their official capacities, are functionally redundant. And finally, to the extent Plaintiff seeks declaratory relief for past violations under prior versions of the Plan, these past injuries are insufficient to establish standing.

Accordingly, Defendants' motions to dismiss (Docs. 33 and 34) are

(1) **DENIED** as to Plaintiff's Counts I, II, III, IV, VIII, and IX as to prior versions of the Plan;

(2) **DENIED** as to Plaintiff's Count X;

(3) **GRANTED** to Plaintiff's Counts I, II, III, IV, VIII, and IX as to the current version of the Plan;

(4) **GRANTED** as to Plaintiff's Counts V, VI, and VII;

(5) **GRANTED** as to Plaintiff's claims against individual Defendants White, Shaffer, and Schulte, sued in their official capacities; and

(6) **GRANTED** as to Plaintiff's request for declaratory relief for past violations under prior versions of the Plan.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: May 17, 2021